# W. R. WALSH v. MANKATO OIL COMPANY AND ANOTHER.
## E. C. FOOTH, APPELLANT.[1]

October 15, 1937.

No. 31,366.

[1]Reported in 275 N. W. 377.

*William Stradtmann,* for appellant.

*Wilson & Wilson, Mortimer H. Boutelle, A. H. David,* and *M. H. Strothman, Jr.,* for respondent.

JULIUS J. OLSON, JUSTICE.

Defendant Footh appeals from an order denying his motion for new trial. The action was brought against two defendants, Footh and Mankato Oil Company, but at the opening of the trial plaintiff stated that he desired to proceed against Footh only, withdrawing his claim for relief against the company. Thus the trial proceeded, resulting in a verdict for plaintiff for $5,056.25. Hereafter we shall refer to Footh as defendant and to Mankato Oil Company as the company.

The facts are somewhat involved, but those essential to intelligent review may be summarized in this fashion: Two brothers, H. W. and E. C. Footh, over a period of many years were operating filling stations, handling gasolene, fuel, and lubricating oils, under the firm name and style of Mankato Oil Company. Plaintiff for some 15 years had been employed by Pure Oil Company of Minneapolis and was there holding a responsible position bringing him an income of approximately $250 per month. On June 15, 1933, he came to Mankato pursuant to negotiations theretofore had with defendant. H. W. Footh desired to liquidate his interest in the partnership. It was accordingly arranged that the copartnership affairs should be incorporated as a domestic corporation. This was done. As between the two brothers the corporate stock was to be issued in exchange for their respective interests in the copartnership, to consist of 620 shares of the par value of $100, each to share equally. A contract was entered into as of July 1, 1933, that being the date when the corporation came into existence, between the brothers and the oil company under the terms of which defendant purchased from his brother the latter's interest in the corporation at the agreed and stipulated price of $31,000. Certain properties were transferred so as to leave an unpaid balance of $22,000. This balance was to be paid in convenient instalments upon a basis of "gallonage" sales. Defendant was given voting control of H. W.

Footh's 310 shares so that the latter was in fact in sole control of the corporate enterprise subject only to compliance by him with the terms of his contract of purchase. It was contemplated at all times that plaintiff was to take over the 220 shares representing the unpaid purchase money. Accordingly, a formal written contract was later entered into between plaintiff and defendant, to which the Mankato Oil Company was a third party, providing that plaintiff and defendant were to devote all their time and attention to the corporate enterprise and the advancement of its purposes; that the net earnings of the corporation should be equally divided between them. Defendant bound himself to sell to plaintiff 220 shares of the corporation's stock out of the 310 shares that he had contracted to purchase from his brother. In payment for the 220 shares (par value $22,000) so to go to plaintiff it was agreed that this was to be met out of plaintiff's one-half share of the net earnings of the corporation, but plaintiff and defendant were each to first have and receive $200 per month, which should "be considered an advancement out of said net earnings." Title to the shares of stock to go to plaintiff was not to pass until sufficient payments had been made to cover the purchase price thereof. H. W. Footh held the entire 310 shares issued to him when the corporation was formed and was to retain them until compliance with the contract on the purchaser's part had been completed. The contract between Footh brothers, to which the oil company was a third party, was specifically made a part and portion of the contract last mentioned. A retroactive clause to July 1, 1933, was inserted therein, so it seems plain that plaintiff had from the beginning an interest in the corporate enterprise and that his half share of the corporation's net earnings was to be $200 a month going directly to him, and anything above that was to go to H. W. Footh to apply upon the balance of the purchase price that defendant Footh had promised to pay his brother.

Plaintiff and defendant apparently worked harmoniously and efficiently pursuant to this arrangement until some time after the formal written contract for the acquisition of the 220 shares was actually drawn up and signed. But discord arose in 1935 between

them. At any rate, shortly before November 1 of that year, plaintiff was told in no uncertain terms that his services were no longer wanted; that he was "all through and that is all there is to it." On November 19. H. W. Footh served notice of cancellation of his contract with defendant, claiming default under its terms. Because thereof, and as to this the parties are in accord, the cancellation became effective 30 days thereafter. Plaintiff was effectively prevented from complying with his part of the agreement; and defendant likewise could not (or at least did not) go through with his part of the contract with his brother. Plaintiff later brought this action, setting forth all the foregoing facts (and much more) as a basis for recovery of damages, with the result hereinbefore mentioned.

There is no controversy that the net earnings of the corporate enterprise above the $200 per month which was paid to both plaintiff and defendant during the time here involved amounted to $10,112.49. Plaintiff's verdict was $5,056.25, exactly one-half.

Defendant assigns several errors, but we think the two questions now to be discussed are determinative of result: (1) Did defendant breach his contract with plaintiff, and (2) if he did, was the proper rule of damages applied by the trial court?

■ Defendant claims that plaintiff's cause, if any he had, was against the oil company as employer and not against himself in his individual capacity; hence that the recovery of damages for plaintiff's discharge, even if without cause, must be had against that company. To be remembered is the fact that the contract for the acquisition of the stock was between plaintiff and defendant. The oil company was a third party. Its interest in that contract consisted only, insofar as money consideration was concerned, of an agreement on its part to pay everything over $200 per month out of plaintiff's share of the one-half of net earnings to H. W. Footh to be applied upon his contract with defendant for the purchase of the 310 shares. We think it clearly appears from the record that the oil company was not the one with whom plaintiff made this deal. The intent and purpose of the contract was to get plaintiff interested in the corporate venture in place of the re-

tiring brother. It was thought that the net earnings going to plaintiff would, in due season, discharge the purchase money due H. W. Footh. Then plaintiff would necessarily have a substantial interest in the corporation, but defendant would still remain the owner of the controlling interest in it. When the deal was made and continuously since that time and until plaintiff was discharged, defendant was in sole control of the corporation. It was his instrumentality and "as much under his control and as subservient to his will as the furniture of his office or the books of account in which he records his transactions. Under such circumstances there is no room for the legal fiction of separate corporate personality or for distinction between the defendant's acts as officer of the corporation and his acts as an independent natural person." Milbrath v. State, 138 Wis. 354, 363, 120 N. W. 252, 255, 131 A. S. R. 1012.

The record abundantly establishes that plaintiff's discharge was defendant's individual act. Plaintiff testified:

Q. "Well, now, you worked there until what time?

A. "Until November 8, 1935.

Q. "What happened on November 8, 1935?

A. "Mr. Footh told me to turn in—turn over the car that I was driving; was a company car, and turn over my keys; I was all through.

Q. "What did you say to him?

A. "I don't recall the exact words; I tried to reason it out with him; that I had a contract and that I had sacrificed a great deal to come down here and quit my job to come down here to go into business with him and—and—to have this come up and have him discharge me; it put me in a pretty bad spot and—we discussed it there in the office and he said, 'Well, you are through and that is all there is to it.'

Q. "What did he say about the contract, Exhibit 1?

A. "Well, when I asked about the contract, Exhibit 1, 'Oh,' he said, 'that don't make any difference, that is, as far as he was concerned; that was a scrap of paper; that that was void as soon as he fired me and he could fire me any time he wanted to.'"

Defendant had this to say:

Q. "Now, you did tell him he could stay there only until when?

A. "Well, I told him at different times that we talked about it, that we could not operate the way we were operating and I told him a month before he left that he would have—

Q. "Wait a minute; when did you tell him that you were through with him, if you did tell him in words to that effect?

A. "Just before the first of November. * * *

Q. "You knew on the first of November, 1935, that you could not fulfill your contract with your brother?

A. "Oh, yes.

Q. "Threw your part over?

A. "Yes, sir.

Q. "And because of that you released him?

A. "And other reasons.

Q. "Well, because of that you would not and could not carry out the contract with him?

A. "Yes."

From the foregoing it seems clear that defendant should not now be permitted to quibble about the result. By his own act he brought about plaintiff's discharge and consequent inability to perform.

At the trial defendant's principal effort was to show plaintiff's insubordination and inattention to duty as justification for the discharge. That question was submitted to the jury, and by the verdict plaintiff's version was found true. The evidence amply sustains that result.

■ The court instructed the jury:

"Plaintiff's entire claim in this case rests upon the breach of contract on the part of E. C. Footh in placing himself in a position where he could not deliver the 220 shares of stock which he had bound himself to deliver to the plaintiff; and I do not think there is any dispute in this case about the proposition that E. C. Footh could not deliver this stock after the cancellation of the contract by his brother, H. W. Footh; so, because of this breach by E. C. Footh the plaintiff in this case has a right to recover from him the

damages he has sustained, unless the plaintiff himself prior thereto neglected or refused to carry out his part of the contract and to render faithful services to the oil company as a result of which he was rightfully and for good cause discharged from his employment with the company.

"The burden of proof as to the matter of damages rests upon the plaintiff in this case to prove that he had been damaged and the extent of his damages; that is, *the extent of his earnings would be the measure of damages in this case.* This point he has to prove by the greater weight of the evidence as to these damages and the amount thereof.

"Stating the issues briefly, if the plaintiff was discharged for cause he cannot recover any damages in this case, and, in that case, your verdict should be a verdict for the defendant, no cause of action.

"On the other hand, if the plaintiff was wrongfully discharged before completing his contract, then he is entitled to recover from the defendant, E. C. Footh, all of the damages which you find from the evidence he has sustained. The measure of damages is the actual loss sustained because of the breach of the contract."

In defendant's behalf it is urged that this breach was after all no more than an anticipatory breach; hence that the cause being founded upon breach of contract the court erred in giving the quoted instruction in respect of plaintiff's earnings. (Italicized above.) Defendant's repudiation of his contract entitled plaintiff "to pursue one of the remedies which the law gives when there has been an anticipatory breach of a contract. It is well settled that where one party repudiates the contract, the other party has an election to pursue one of three remedies: (1) To treat the contract as rescinded and avail himself of the remedies which may be based on a rescission; (2) to treat the contract as still binding and wait until the time arrives for its performance and then sue and recover under the contract; (3) to treat the renunciation as an immediate breach and sue at once for any damages which he may have sus-

tained." (Citing many cases.) Engel v. Mahlen, 153 Minn. 1, 4, 5, 189 N. W. 422, 423.

Plaintiff having pleaded all the facts upon which his cause was founded, it is obvious that what he here sought was to recover that with which he had parted, namely, his one-half of the net earnings of the corporation during the time he was employed insofar as the same exceeded $200 per month.

■ Under our system of code pleading, the specific facts set out in a pleading must speak for themselves, and no labeling of it is essential to its validity, nor need the legal conclusions to be drawn therefrom be stated. "So where facts are specifically averred showing fraud, mistake, undue influence, adequacy of consideration, usury, waiver, *rescission of a contract,* or the existence of a legal duty, *it is not necessary to state the conclusion of law arising from such facts.*" (Italics supplied.) 49 C. J. [§ 19] p. 48. See also Buck v. Colbath, 7 Minn. 238 (310), 82 Am. D. 91 (affirmed 3 Wall. 334, 18 L. ed. 257) ; Boston Clothing Co. v. Garland, 90 Minn. 520, 97 N. W. 433; Oevermann v. Loebertmann, 68 Minn. 162, 70 N. W. 1084. "It is unnecessary and improper to label a complaint to characterize it. Forms of action are abolished and the nature of a cause of action is to be determined by the facts alleged and not by the formal character of the complaint." 5 Dunnell, Minn. Dig. (2 ed.) § 7526a, and cases cited under notes. "In an action founded on either contract or tort the plaintiff is not required to state on which he relies, and, if he makes such a statement and is mistaken the statement is immaterial. Recovery may be had either for tort or breach of contract, if the facts proved within the allegations of the pleading justify it, though the pleader was mistaken as to the nature of his cause of action." *Id.,* § 7528b, and cases cited under notes.

There are other assignments of error which in view of what has been stated we consider unimportant and certainly not such as to require the reversal of an obviously just result.

Order affirmed.